NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | **Criminal No. 12-241 (SRC)** |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| LEON Z. ABNEY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**CHESLER**, District Judge

This matter comes before the Court upon the motion by Defendant Leon Z. Abney ("Defendant" or "Abney") to suppress a firearm and ammunition discovered in connection with his December 20, 2011 arrest on the grounds that the search and seizure were invalid under the Fourth Amendment.  Abney further moves to suppress statements he made during questioning at the police station following his arrest.  Defendant, the United States of America (the "Government"), has opposed the motion.  From the initial briefing on the motion, the Court discerned a dispute between Abney and the Government regarding the circumstances of Abney's arrest.  Accordingly, on August 22, 2012, the Court held an evidentiary hearing, as requested by Abney.

1

The Court has evaluated the evidence and considered the papers filed by the parties, including supplemental briefs submitted after the hearing.  For the reasons discussed below, the Court will deny Abney's motion to suppress.

## I.   FACTS

This action concerns a one-count Indictment stemming from Abney's December 20, 2011 arrest.  The Indictment charges that Abney, having been convicted of a crime punishable by imprisonment for a term exceeding one year in a court in the State of New Jersey, knowingly possessed a firearm and ammunition, in violation of 18 U.S.C.  § 922(g)(1).  This motion principally concerns whether the search of Abney's person when he was stopped by police on the morning of December 20, 2011 was supported by reasonable suspicion, as required by the Fourth Amendment.

The record developed at the suppression hearing provides two versions of the incidents leading up to and surrounding Abney's arrest.  The Court heard testimony from Abney as well as from the four Newark police officers involved in his arrest and/or the subsequent interrogation. Those officers are Detective Heriberto Figueroa, Sergeant Joseph Frost, Detective Francisco Martinez and Detective Raul Diaz. The Court first sets forth the version given by Abney and then summarizes the pertinent facts of the competing version based on the officers' testimony.

According to Abney, on the morning of December 20, 2011, he put on a black pea coat and began to walk from his home on South 19th Street in Newark to his mother's house on Sunset Avenue, also in Newark.  He admits that he was carrying a gun and ammunition but testified that, before leaving home, he placed the gun in the coat's left interior chest level pocket

and placed the magazine in the opposite pocket of the coat.  He also zippered and buttoned the coat due to the cold weather.

Abney asserts that he was walking north on 21st Street, towards Nelson Place, in Irvington, New Jersey, when he noticed a van parked on the corner of Nelson Place and 21st Street.  He noticed that there were two men standing outside the van facing and talking to a third man, who was African American.  Abney states that, based on his observations of the group, he suspected that the two men facing the African American were police officers.  He passed the group, claiming that he made no eye contact or suspicious movements, and turned left on Nelson Place and then right, back on to 21st Street.

Abney claims that as he walked on 21st Street, one of the two officers he had observed outside the van shouted "come here" to Abney but that he continued walking, as he had done nothing wrong.  According to Abney, the officers then physically accosted Abney, disregarded his pleas to stop and pushed him to the ground.  Abney testified that he did not resist and there, while on the ground, said to the officers, "I'm done, you got me, I'm on the ground now. Let me unzip and unbutton my coat now."  Abney explained at the hearing that he had learned not to resist from previous encounters, which had taught him that even appearing to resist would risk being punched by law enforcement.  The gun and magazine were discovered and removed from his coat.  Abney was then handcuffed and placed in the van, which was driven by a third officer. Abney later learned the identities of the officers involved in his arrest:  the two officers who detained and searched him were Detective Figueroa and Sergeant Joseph Frost, and the officer driving the van was Detective Martinez.

After Abney arrived at police headquarters, he was questioned by Detective Raul Diaz. Abney testified that this interview occurred without counsel present and without the prior

issuance of a Miranda warning.  He further testified that during the interview, he did not state that he purchased the gun with drug proceeds.  During the hearing, he explained that he bought the gun with money he earned while working as a chef.

According to the testimony of the four law enforcement witnesses, the salient details of the incident are as follows:  Figueroa, Frost and Martinez were on patrol in an unmarked van on 20th Street in Newark, known to be a high-crime area.  As it proceeded northbound on that street, the van passed Abney, who was travelling northbound on foot.  Detective Figueroa observed Abney remove a black handgun from his waistband and put it in the inside pocket of his coat. Martinez, who was driving, pulled the van over, and all three officers got out, identified themselves as police to Abney and attempted to stop him.  Abney ran from the officers. Figueroa and Frost chased Abney, and Martinez got back in the van and pursued in the vehicle. Upon apprehending him on 21st Street in Irvington, New Jersey, Figueroa and Frost discovered a black Glock Model 23 .40 caliber pistol from Abney's coat as well as a high capacity magazine containing 16 hollow point bullets.  Abney was arrested and handcuffed.

The van arrived at the scene of the arrest after Abney had been handcuffed.  Abney was transported to the police station.  Later that morning, he was questioned by Detective Diaz about the firearm.  Detective Diaz, who serves as Newark Police Department's liaison with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives, is tasked with interviewing individuals arrested with firearms to gather information about the source of the firearm, among other matters.  According to Diaz, Abney was read his Miranda warnings but refused to sign the form acknowledging that he had received the warnings.  Detective Diaz testified that Abney admitted to him that he purchased the Glock handgun from an unknown black male for $550 from the proceeds of narcotics sales.

4

II.    **D**ISCUSSION

A.   **Handgun and Ammunition Evidence**

Abney moves to suppress the handgun and ammunition on the grounds that this evidence was obtained in an unreasonable seizure and search of his person, in violation of the Fourth Amendment.  A defendant who files a motion to suppress bears the burden of establishing, by a preponderance of the evidence, that his Fourth Amendment rights were violated.  See United States v. Acosta, 965 F.2d 1248, 1257 n. 9 (3d Cir. 1992).

The Fourth Amendment guarantees an individual's freedom from "unreasonable government intrusion."  Terry v. Ohio, 392 U.S. 1, 9 (1968).  It "applies to seizures of the person, including brief investigatory stops . . . ."  United States v. Cortez, 449 U.S. 411, 417 (1981). In Terry v. Ohio, the Supreme Court articulated the justification required under the Fourth Amendment to conduct such an investigatory stop and limited search of the detained person.  It requires reasonable suspicion by a police officer "that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . . ." Terry, 392 U.S. at 30.  Reasonable suspicion exists when the officer  has "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  Cortez, 449 U.S. at 417-18. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Cortez, 449 U.S. at 418).  To make a reasonable suspicion determination, the Court must consider the totality of the circumstances.  Id.

Making the reasonable suspicion determination in this case requires the Court to weigh the testimony of Figueroa, Frost and Martinez against the testimony given by Abney at the suppression hearing.  In other words, the decision on Abney's suppression motion turns on the witnesses' credibility.  See Peretz v. United States, 501 U.S. 923, 939 (1991) (observing that determination in a suppression hearing "often turns on the credibility of witnesses.").  "Before denying a defendant's request to suppress evidence, the Court must find that the government's presentation of the facts and the testimony of its witnesses are more credible than the version recited by the defendant."  United States v. Marrero, 1991 WL 45058, at *3 (S.D.N.Y. Mar. 26, 1991).

Here, the Court finds the testimony of the officers as to events at and around the time of Abney's arrest more credible than Abney's testimony regarding the incident.  Detective Figueroa testified that, from the van on patrol on South 20th Street, he saw Abney remove a gun from his jacket as he walked northbound along the same street.  Both of the other officers in the van, Detective Martinez and Sergeant Front, testified that Figueroa communicated this observation to them.  The officers further testified, in a consistent manner, that after they identified themselves to Abney as police and attempted to stop him, Abney ran from the officers.  Defendant points out that Detective Figueroa admits that he observed nothing suspicious about Abney when he first saw Abney, as the van drove northbound past him, and that it was only when Figueroa moved to the back of the van to have a second look at Abney that he claims to have seen the gun.  Defendant argues that Figueroa's account is not plausible because there is no reason for this second look.  There is no question, however, that on the morning of the arrest, Defendant carried on his person a handgun and magazine.  The officers were patrolling the area, which is known to be a high-crime area, and, as Detective Figueroa testified, specifically tasked with looking for

6

suspicious activity and paying attention to their surroundings.  Figueroa testified that he observed the gun and communicated this observation to the other officers, prompting the officer driving to pull over and prompting the officers to get out of the van to approach Abney.  The testimony of Frost and Martinez is consistent with Figueroa's account regarding his observation and, moreover, with the account that Abney ran from the officers when asked to stop.

Further weighing in favor of crediting the officers' account is the implausibility of Abney's assertion that the police officers saw him and initially approached him on South 21st street, which is located over the Newark border in Irvington.  The officers, in contrast, testified that they had to chase Abney to South 21st Street.  Abney's account as to the location is implausible for two reasons: (1) Abney's description of the initiation of the officers' interaction with him on South 21st Street would inexplicably place Newark police officers on patrol on a street in Irvington and (2) the direct route from his house to his mother's house would have him proceeding along South 20th Street, consistent with the officers' testimony, whereas Abney's testimony has him taking a circuitous, "zig-zagging" route.  Abney's explanation that he took the circuitous route in a deliberate attempt to avoid a negative encounter with the police is undermined by his decision to arm himself for the walk to visit his mother, a decision that would seem to increase the likelihood of a negative encounter with law enforcement.

Defendant attempts to cast doubt on the critical testimony that Abney was observed re-positioning a gun on his person by drawing attention to the admission that the officers who chased Abney did not unholster their guns while in pursuit.  Abney argues that such inaction is inconsistent with the danger presented by a situation in which the suspect being pursued is known or believed to be armed and inconsistent with the officers' training and experience.  The pursuit, however, involved a running chase on foot, over only 500 feet and lasting less than a

minute. It appears to the Court, however, that an equally if not more plausible explanation would be the lack of opportunity for the officers to access their weapons during the chase.

Defendant points to other details he believes reveal damaging inconsistencies in the factual record and thus, in his view, demonstrate the officers' lack of credibility. For example, Abney notes that Detective Figueroa indicated in the incident report relating to the arrest that there were no visible cameras in the area of the arrest even though there are in fact three cameras on the building in front of which Abney was arrested.  Although the record also reflects that, according to the officers, no procedure required them to canvass the area for cameras, Abney argues that this discrepancy reflects Figueroa's carelessness and lack of credibility.  Abney also emphasizes that when asked why he did not radio in the incident in compliance with the procedure applicable to pursuits of armed persons, Sergeant Frost claims to have lost his walkie talkie in the chase, an explanation that Abney argues is fabricated because the walkie talkie was never found.  He argues that the purported inability to find the radio, in spite of the small area where it could have been lost, casts doubt on Sergeant Frost's claim that he lost the device during this pursuit and therefore casts doubt on the veracity of Frost's entire account of the incident.

These inconsistencies, to use Abney's characterization, do not concern any relevant matters nor rise to the level of any particular significance in the account of Abney's stop, search and arrest.  In the Court's view, they do not diminish the officers' credibility.  For the reasons discussed above, the Court credits the version of events presented by the Government's witnesses at the suppression hearing.

The testimony given by the law enforcement witnesses at the suppression hearing supports a finding that, based on the observation of the handgun and Abney's decision to run away from the police when they identified themselves and asked him to stop, the officers had

reasonable suspicion that criminal activity was afoot.  In other words, in light of the totality of

the circumstances, they had a particularized and objective basis to suspect that Abney was

engaged in criminal activity.  Defendant has not met his burden of establishing that the

December 20, 2011 search and seizure was invalid under the Fourth Amendment.  Thus, as to the

first aspect of this suppression motion, concerning the handgun and ammunition recovered

during the investigatory stop of Abney, the Court concludes that the motion must be denied.

### B.   Statements to Detective Diaz

The second part of Abney's motion to suppress concerns the statements Abney made to

Detective Diaz.[1]  Though he argues that they are inadmissible as having been tainted by the

invalid search and seizure, this argument is unavailing in light of the Court's conclusion that the

search and seizure did not violate the Fourth Amendment.  Alternatively, he argues that the

statements must be suppressed because they were given without Miranda warnings, in violation

of Abney's Fifth Amendment right against self-incrimination.

The Fifth Amendment guarantees that "no person  . . . shall be compelled in any criminal

case to be a witness against himself."  New York v. Quarles, 467 U.S. 649, 654 (1984).  The

Fifth Amendment has been interpreted to require that a person subjected to custodial

interrogation must be advised of his rights before making a statement.  See Miranda v. Arizona,

384 U.S. 436, 444 (1966).  In Miranda, the Supreme Court held that "the prosecution may not

use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the

defendant unless it demonstrates the use of procedural safeguards effective to secure the

---

[1] The Government notes in its initial brief that although Abney also made statements to the arresting officers
immediately after they apprehended him, Abney has not sought to suppress those statements.  Indeed, neither
Abney's moving brief nor his supplemental post-hearing brief addresses the statements made at the time of arrest,
and Abney does not counter the Government's understanding that such statements are not at issue.  Thus, the Court
limits its analysis to the statements made by Abney is his custodial interview by Diaz at the police station.

privilege against self-incrimination." Id. "The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).

There is no question that Abney was in custody when Diaz questioned him about the firearm or that the interview constituted an interrogation as defined by Fifth Amendment jurisprudence. See id. at 301 (defining interrogation); Minnesota v. Murphy, 465 U.S. 420, 430 (1984) (defining when a person is in custody). This motion revolves around the issue of whether Abney was given Miranda warnings before he spoke to Detective Diaz. Resolving that issue comes down to a question of credibility.

Abney argues that although two forms completed by Diaz, the Miranda Warning Form and the Debriefing Form, report that Abney was Mirandized prior to the interview, this paperwork and Diaz's testimony are not reliable because the paperwork contains numerous deficiencies. One of these is the failure to obtain a witness signature on the Miranda Warning Form, despite the availability of other officers to witness that Abney refused to sign the form. Abney argues that this undercuts Diaz's credibility as to his assertion that he followed protocol in connection with the Abney interview. Abney also points to the fact that both forms note a time of 8:30 a.m., even though Diaz admitted at the hearing that the interview did not take place until some time after 10 that morning. His explanation that he wrote the time he was notified of the arrest, rather than the interview time, fails to make sense, according to Abney, because the first call to dispatch regarding the arrest is logged as having come in at 8:51 a.m.

In spite of Abney's various efforts to call into question the testimony of Detective Diaz, it remains that the record reflects that Abney was in fact Mirandized before his custodial interview. The Court has been presented with nothing more than Abney's conclusory assertion that he was

not given the required warnings before he spoke to Detective Diaz.  Neither this assertion nor

Diaz's testimony at the hearing support a finding that the documentation prepared in connection

with Abney's arrest and interrogation falsely reports that Abney was issued his Miranda

warnings.

　　　　The Court therefore concludes that Abney has not demonstrated that the statements were

obtained in violation of the Fifth Amendment.  His motion to suppress them will be denied.


**III.    CONCLUSION**

　　　　For the foregoing reasons, Abney's motion to suppress evidence will be denied in its

entirety.  An appropriate order accompanies this Opinion.



　　　　　　　　　　　　　　　　　　　　 　s/Stanley R. Chesler
　　　　　　　　　　　　　　　　　　　　 STANLEY R. CHESLER
　　　　　　　　　　　　　　　　　　　　 United States District Judge


Dated:  March 6, 2013